Revised April 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 96-60821
_____

WAZIRALI MOOSA, also known as Wazir Ali Haider
Ali Moosa; ZEBUNISA WAZIRALI MOOSA,

Petitioners,

versus

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

_____

On Petition For Review From The Board
Of Immigration Appeals and Legalization Appeals Unit
_____

April 2, 1999

Before REYNALDO G. GARZA, POLITZ, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge.

A deferred adjudication of guilt for indecency with a child by contact having been entered against Wazirali Moosa in Texas state court in 1990, and, as a result, Moosa having been denied permanent residency and having been ordered deported, along with his wife, primarily at issue is, in the legalization decision, the retroactive application to that deferred adjudication of the new definition of "conviction" in § 322(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, codified at 8 U.S.C. § 1101(a)(48)(A). At issue are whether the Legalization

Appeals Unit erred in denying Moosa permanent resident status; whether we have jurisdiction to review the denial by the Board of Immigration Appeals of suspension of deportation as to the Moosas; and, if we do have jurisdiction, whether that denial was in error. We **DENY** the petition from the legalization decision. Because we lack jurisdiction over the deportation decision, we **DISMISS** that petition.

## I.

Moosa, a native of Pakistan, entered the United States in 1979 as a nonimmigrant visitor. Four years later, his wife, Zebunisa Moosa, and their two young daughters joined him, also entering as nonimmigrant visitors. Eventually, the Moosas settled in Texas, where Moosa was employed, Mrs. Moosa tended to the needs of the household, and the two daughters enrolled in (and eventually graduated from) public school.

In September 1988, the INS approved Moosa's application for temporary resident status. In April 1989, he applied to the INS to adjust his status to permanent resident.

Later in 1989, Moosa was indicted in Texas for indecency with a child by contact (a second-degree felony), stemming from an incident occurring in early April of that year. The indictment charged Moosa with molesting a twelve-year-old girl. Moosa pleaded guilty in January 1990. The following month, a Texas court entered a deferred adjudication of guilt and placed Moosa on eight years

probation.  He also served 180 days in jail on a work release program and was ordered, among other things, to attend therapy sessions, avoid contact with children, and report monthly to a probation officer.[1]  (Moosa complied with these requirements, and was released from community supervision early, in 1993 or 1994.[2])

In February 1992, interpreting Moosa's deferred adjudication as a "conviction" that rendered him ineligible for legalization, the Legalization Director issued notice of intent to deny his permanent residency application.  The application was formally

---

[1]The "deferred adjudication" procedure is found in Texas Code of Criminal Procedure Article 42.12 § 5.  After a defendant has pleaded guilty or *nolo contendere*, the judge may, pursuant to § 5(a), "defer further proceedings without entering an adjudication of guilt, and place the defendant on community supervision".  Under § 5(b), if the defendant violates a condition of the community supervision, he may be arrested and his guilt on the original charge may be adjudicated.  "After an adjudication of guilt, all proceedings, including assessment of punishment, pronouncement of sentence, granting of community supervision, and defendant's appeal continue as if adjudication of guilt had not been deferred."  TEX. CODE CRIM. P. ART. 42.12 § 5(b).  However, if the defendant successfully completes his community supervision and "the judge has not proceeded to adjudication of guilt, the judge shall dismiss the proceedings against the defendant and discharge him".  TEX. CODE CRIM. P. ART. 42.12 § 5(c).  Additionally, the judge may dismiss the proceedings and discharge the defendant from community supervision early, if the judge deems such action to be in "the best interest of society and the defendant".  TEX. CODE CRIM. P. ART. 42.12 § 5(c).  Finally, § 5(c) provides that "a dismissal and discharge under this section may not be deemed a conviction for the purposes of disqualifications or disabilities imposed by law for conviction of an offense".

[2]Moosa's release date from community supervision is unclear.  A brief to the INS by Moosa's former attorney states that Moosa was discharged in June 1994.  Moosa testified before the Immigration Judge that he was discharged in 1993.

denied on 20 April 1992.

Two weeks later, on 4 May, Moosa appealed the termination of his temporary resident status to the Legalization Appeals Unit (LAU).[3]  His notice of appeal was returned for failure to include the filing fee.  On 22 May, the notice was refiled with the fee.  In July 1994, the LAU dismissed the appeal as untimely for having been filed more than 30 days after the Legalization Director's decision.

The INS commenced deportation proceedings in March 1995 against Mr. and Mrs. Moosa and their daughters (then in their early 20s), for overstaying an authorized period of stay, pursuant to 8 U.S.C. § 1251(a)(1)(B).  The Moosas applied for suspension of deportation under 8 U.S.C. § 1254(a) (now repealed), and a deportation hearing was held in March 1996.  The family claimed that deportation would impose extreme hardship, justifying a suspension.

The Immigration Judge (IJ) suspended the deportation of the Moosas' daughters; however, suspension was denied for Mr. and Mrs.

---

[3]This appellate division is referred to as the "Legalization Appeals Unit" because that is the title used by our circuit.  *See* **Martinez-Montoya v. INS**, 904 F.2d 1018, 1020 (5th Cir. 1990).  It is an internal division of the Administrative Appeals Unit of the INS that decides cases arising under the authority of the Associate Commissioner for Examinations.  8 C.F.R. §§ 103.1(f)(2); 245a.2(u)(2) and 245a.3(j).  *See* **Martinez-Montoya**, 904 F.2d at 1023 ("The LAU is the sole body within the AAU possessing jurisdiction to hear appeals from the administrative denial of an application for legalization under the provisions of [8 U.S.C. § 1255a]").

Moosa. The IJ found the serious nature of Moosa's admitted child molestations outweighed any favorable factors and "den[ied] his application for suspension of deportation as a matter of discretion". The IJ denied suspension of Mrs. Moosa's deportation on the basis that she had not demonstrated "extreme hardship", particularly in view of the fact that her husband's application had been denied. The IJ did, however, grant the Moosas the privilege of voluntary departure in lieu of deportation, pursuant to 8 U.S.C. § 1254(e).

The Moosas appealed to the Board of Immigration Appeals; it affirmed in October 1996. The BIA agreed that Mrs. Moosa had not shown extreme hardship merely by alleging economic hardship, diabetes, and a bad back. The BIA denied relief to Moosa primarily because of his sexual contact with children and because it was not convinced he was rehabilitated. The BIA described his conduct as "serious" and "predatory" and found that "a favorable exercise of discretion is not warranted". The Moosas petitioned this court for review of the BIA's decision.

But, after the Moosas' opening brief was filed with our court, the INS discovered that the LAU had erred in July 1994 when it dismissed as untimely Moosa's appeal of the permanent resident status decision. Instead, the INS concluded that the appeal *was* timely. On joint motion, our court in May 1997 remanded the legalization question to the LAU. The following December, applying

the new definition of "conviction" found in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. Law 104-208, 110 Stat. 3009 (1996) (IIRIRA), the LAU upheld the decision of the Legalization Director.

Therefore, the petitions at hand are from the LAU's December 1997 decision affirming the denial of Moosa's permanent resident application and from the BIA's decision denying a suspension of deportation to Mr. and Mrs. Moosa.  For the latter, the INS has moved to dismiss for lack of jurisdiction.

II.

A.

Moosa, who was given temporary resident status in 1988, applied for permanent residency in 1989 under 8 U.S.C. § 1255a, enacted as part of the "legalization" or "amnesty" provisions of the Immigration Reform and Control Act of 1986.  *See* **Hussein v. INS**, 61 F.3d 377, 378 (5th Cir. 1995).  The regulations provide that temporary residence granted an alien will terminate if he does not apply for permanent residence within 43 months.  8 U.S.C. 1255a(b)(2)(C).  The local Legalization Director is required to give the alien notice and an opportunity to respond before terminating the temporary residency. **Luevano v. INS**, 5 F.3d 546, 1993 WL 335750, *1 (10th Cir. 1993)(unpublished). Notification of, and reasons for, a final decision to terminate must also be provided to the alien.  **Id.**  "Once an alien's temporary resident

status is terminated, he automatically returns to the unlawful status he held before he received the temporary resident status and is amenable to deportation or exclusion proceedings." *Id.* (citing 8 C.F.R. 245a.2(u)(4)); 8 U.S.C. 1255a(b)(2)(C)) (Attorney General shall terminate temporary residence at end of 43rd month after alien was granted status unless application for adjustment has been filed and "has not been denied").

Permanent residence may *not* be granted aliens "convicted" of a felony. 8 U.S.C. § 1255a(b)(1)(C)(ii). Yet, prior to 1996, there was no statutory definition of "conviction". Beginning with the Supreme Court's brief decision in *Pino v. Landon*, 349 U.S. 901 (1955) (per curiam), courts construed the term "conviction" in immigration laws to encompass some degree of finality of the judgment or disposition under state law.[4]

In 1988, the BIA defined "conviction" in *Matter of Ozkok*, 19 I&N Dec. 546 (BIA 1988). In *Ozkok*, the BIA examined its previous decisions, which looked to the state law effect of the conviction in order to determine if the finality requirement had been met. *Id.* at 549-50. The BIA noted that "most states now employ some method of ameliorating the consequences of a conviction"; and that "the standard which [the BIA had] applied to the many variations in

---

[4]The entire *Pino* opinion follows: "On the record here we are unable to say that the conviction has attained such finality as to support an order of deportation within the contemplation of § 241 of the Immigration and Nationality Act, 8 U.S.C.A. § 1251. The judgment is reversed". *Pino*, 349 U.S. at 901.

- 7 -

state procedure may permit anomalous and unfair results in determining which aliens are considered convicted for immigration purposes". *Id.* at 550. Therefore, the BIA revised the standard for determining whether a state conviction was to be considered a "conviction" for purposes of immigration law, eliminated the requirement that the state law effect of the conviction be examined, and created the following standard:

> Where adjudication of guilt has been withheld, however, further examination of the specific procedure used and the state authority under which the court acted will be necessary. As a general rule, a conviction will be found for immigration purposes where all of the following elements are present:
>
> (1) a judge or jury has found the alien guilty or he has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilty;
>
> (2) the judge has ordered some form of punishment, penalty, or restraint on the person's liberty to be imposed (including but not limited to incarceration, probation, a fine or restitution, or community-based sanctions such as a rehabilitation program, a work-release or study-release program, revocation or suspension of a driver's license, deprivation of nonessential activities or privileges, or community service); and
>
> (3) a judgment or adjudication of guilt may be entered if the person violates the terms of his probation or fails to comply with the requirements of the court's order, without availability of further proceedings regarding the person's guilt or innocence of the original charge.

*Id.* at 551-52.  Superimposed on these three requirements was the finality requirement.  *Id.* at 553 n.7 ("It is well established that a conviction does not attain a sufficient degree of finality for immigration purposes until direct appellate review of the conviction has been exhausted or waived"); *White v. INS*, 17 F.3d 475, 479 (1st Cir. 1994).

But, in *Matter of M*, 19 I&N Dec. 861 (1989), contrary to the BIA's conditions, the LAU defined "conviction" *without* a finality requirement and found a Texas deferred adjudication to be a "conviction" that barred permanent residency.  The LAU held that, for purposes of 8 U.S.C. § 1255a, a "conviction" would be found when an adjudication possessed the following two elements:

> (1) a judge or jury has found the alien guilty or he has entered a plea of guilty or nolo contendere; and
>
> (2) the judge has ordered some form of punishment or penalty, including but not limited to a fine or probation.

*Id.* at 865.  Because the Texas deferred adjudication satisfied both elements, the LAU determined that the petitioner (who had received a deferred adjudication for forgery) had been "convicted".

The petitioner in *Matter of M* contested the LAU's decision, and our court reversed in *Martinez-Montoya v. INS*, 904 F.2d 1018 (5th Cir. 1990).  Our court first found that "at least the LAU is bound to apply the BIA definition of conviction recognized in *Matter of Ozkok*, and that, under the *Ozkok* standard, Martinez-

- 9 -

Montoya has not been convicted for purposes of immigration". *Id.* at 1022. This was based on INS regulations that required all INS employees to follow BIA decisions. *Id.* at 1023. Accordingly, Martinez-Montoya's deferred adjudication was examined under the *Ozkok* standard.

Because the defendant in a deferred adjudication faces further proceedings if he violates the terms of the community supervision, the court stated that the third prong of the *Ozkok* test (which requires that there be no further proceedings available) was not met by the deferred adjudication. *Id.* at 1024. Furthermore, the court found that the deferred adjudication did not satisfy the additional finality requirement of *Ozkok* because Martinez-Montoya could still appeal a finding of guilt if one were entered against him. *Id.* at 1025.

Therefore, our court determined that a Texas deferred adjudication was not a "conviction" for purposes of federal immigration law. *See also* **Zamora-Morel v. INS**, 905 F.2d 833, 839 n.3 (5th Cir. 1990) (recognizing that, under **Martinez-Montoya**, Texas deferred adjudication is not a "conviction" for immigration law purposes). *But see* **Molina v. INS**, 981 F.2d 14, 18-20 (1st Cir. 1992) (Rhode Island *nolo contendere* plea plus probation, which was not considered "conviction" under state law after successful completion of probation, was "conviction" under federal immigration laws); **Yanez-Popp v. INS**, 998 F.2d 231, 233, 237 (4th Cir. 1993)

(Maryland's stay of judgment conditioned on successful completion of probation was "conviction" under *Ozkok*); *Chong v. INS*, 890 F.2d 284, 284-85 (11th Cir. 1989) (Florida procedure of withholding adjudication of guilt and imposition of sentence but placement of defendant on probation was "conviction" for immigration purposes under *Ozkok*).

Following receipt of the INS's notice of intent, based on Moosa's deferred adjudication, to deny permanent residency (thus terminating his temporary residency), Moosa's attorney apprised the Legalization Director of *Martinez-Montoya*'s holding that a Texas deferred adjudication was not a "conviction". This notwithstanding, the Legalization Director did not mention *Martinez-Montoya* in his April 1992 decision; instead, he relied on *Ozkok* in concluding that the deferred adjudication was a "conviction".

On 30 September 1996, IIRIRA was enacted; it became effective on 1 April 1997. Section 322(a) defined the term "conviction" and amended § 101(a) of the Immigration and Nationality Act of 1952 (INA), 8 U.S.C. § 1101(a). Section 322(a) states:

> The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by the court or, if adjudication of guilt has been withheld, where –
>
> (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

- 11 -

> (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

Codified at 8 U.S.C. § 1101(a)(48)(A). Thus, by eliminating the finality requirement, the new statutory definition of "conviction" mirrors the *Matter of M* definition, rejected by our court in *Martinez-Montoya*.

The Congressional Conference Committee Report accompanying IIRIRA commented on Congressional intent in drafting IIRIRA § 322:

> This section *deliberately* broadens the scope of the definition of "conviction" beyond that adopted by the Board of Immigration Appeals in *Matter of Ozkok*, 19 I&N Dec. 546 (BIA 1988). As the Board noted in *Ozkok*, there exist in the various States a myriad of provisions for ameliorating the effects of a conviction. As a result, aliens who have clearly been guilty of criminal behavior and whom Congress intended to be considered "convicted" have escaped the immigration consequences normally attendant upon a conviction. *Ozkok*, while making it more difficult for alien criminals to escape such consequences, does not go far enough to address situations where a judgment of guilt or imposition of sentence is suspended, conditioned upon the alien's future good behavior. For example, the third prong of *Ozkok* requires that a judgment or adjudication of guilt may be entered if the alien violates a term or condition of probation, without the need for any further proceedings regarding guilt or innocence on the original charge. In some States, adjudication may be "deferred" upon a finding or confession of guilt, and a final judgment of guilt may not be imposed if the alien violates probation until there is an additional proceeding regarding the alien's guilt or innocence. In such cases, the third prong of the *Ozkok* definition prevents the original finding or confession of guilt to be

- 12 -

> considered a "conviction" for deportation purposes. *This new provision, by removing the third prong of **Ozkok**, clarifies Congressional intent that even in cases where adjudication is "deferred," the original finding or confession of guilt is sufficient to establish a "conviction" for purposes of the immigration laws.*

H.R. Conf. Rep. No. 828, 104th Cong., 2nd Sess. 1996, 1996 WL 563320 at *496-97 (emphasis added).

As noted, Moosa's appeal of the Legalization Director's decision to the LAU was dismissed as untimely. It was not until the petition in issue was filed that the INS discovered its mistake and the matter was remanded to the LAU. Pursuant to the newly enacted § 322(a) definition of conviction, the LAU found that the deferred adjudication was a "conviction", and affirmed the Legalization Director's decision.

The legal and factual events can be summarized as follows: (1) in January 1989, the LAU rendered its decision in **Matter of M**; (2) in April 1989, Moosa molested a child and applied for permanent residency; (3) later in 1989, Moosa was indicted for indecency with a child; (4) in January 1990, Moosa entered into a plea agreement; (5) in February 1990, the Texas court entered a deferred adjudication; (6) in July 1990, **Martinez-Montoya** was rendered, reversing **Matter of M**; (7) in April 1992, Moosa's temporary resident status was terminated; (8) in July 1994, the LAU dismissed Moosa's appeal as untimely; (9) in 1996, IIRIRA was signed into law; (10) in 1997, the INS discovered its mistake, the case was

- 13 -

remanded to the LAU, and the LAU applied § 322 to affirm the Legalization Director's decision.

Moosa's challenge to the LAU decision rests on two sub-issues: (1) whether the INS is estopped from terminating his temporary residency; and (2) whether the LAU erred in applying § 322(a).

1.

Moosa bases his estoppel claim on the charge that the INS engaged in affirmative misconduct in two ways: the dismissal of his appeal to the LAU as untimely; and the Legalization Director's not complying with our circuit precedent for the definition of a "conviction".

"To establish estoppel against the government, a party must prove affirmative misconduct by the government and also establish the four traditional elements of the doctrine. The four elements of estoppel are: (1) that the party to be estopped was aware of the facts, and (2) intended his act or omission to be acted upon; (3) that the party asserting estoppel did not have knowledge of the facts, and (4) reasonably relied on the conduct of the other to his substantial injury." *United States v. Bloom*, 112 F.3d 200, 205 (5th Cir. 1997). Valid assertions of equitable estoppel against the Government are rare indeed. *Id.; see also Ferguson v. FDIC*, 164 F.3d 894, 898 (5th Cir. 1999); *Rew Enterprises, Inc. v. Premier Bank, N.A.*, 49 F.3d 163, 167 (5th Cir. 1995); *United States v. Perez-Torres*, 15 F.3d 403, 407 (5th Cir.), *cert. denied*, 513 U.S.

840 (1994) ("Estoppel against the government is problematical at best").

In several cases involving claims that the INS should be estopped based on conduct of its agents, the Supreme Court has held that the conduct did not rise to the level of "affirmative misconduct" and declined to estop the INS. *See **INS v. Miranda***, 459 U.S. 14, 18-19 (1982) (INS's 18 month delay in processing alien's application for permanent residency did not constitute affirmative misconduct); ***INS v. Hibi***, 414 U.S. 5, 8-9 (1973) (failure of Government to publicize immigration rights afforded by Congress to Philippine soldiers before deadline to apply for immigration benefits expired did not amount to affirmative misconduct); ***Montana v. Kennedy***, 366 U.S. 308, 314-15 (1961) (failure of American Consular Officer in Italy to issue passport to alien's pregnant mother, resulting in alien's birth in Italy, did not constitute affirmative misconduct); *see also **Schweiker v. Hansen***, 450 U.S. 785, 788-90 (1981) (Social Security Administration agent's erroneous response to applicant's inquiry and failure to have applicant complete written request, as internal regulations required, were not enough for applicant to succeed on estoppel claim against Government).

Likewise, our court has declined to estop the INS based on claims that the INS's conduct caused the denials of immigration benefits. *See **Fano v. O'Neill***, 806 F.2d 1262, 1265 (5th Cir. 1987)

(failure of INS to expedite processing of alien's application, as required by INS's internal operating instructions, did not constitute affirmative misconduct; "to state a cause of action for estoppel against the government, a private party must allege more than mere negligence, delay, inaction, or failure to follow an internal agency guideline"); *Kwon v. INS*, 646 F.2d 909, 919 (5th Cir. 1981)(en banc) (court would not estop INS where its failure to inform alien of lack of further visa numbers prevented alien from promptly applying for different type of visa).

In fact, the Supreme Court has not decided whether the INS can *ever* be estopped from enforcing immigration laws because of its misconduct. *See Miranda*, 459 U.S. at 19 (refusing to estop Government because no affirmative misconduct, but reserving question of whether Government could ever be estopped from enforcing immigration laws); *Hibi*, 414 U.S. at 8-9 (recognizing that question of whether affirmative misconduct could estop Government from denying citizenship was left open in *Montana*, but declining to address because found no affirmative misconduct); *Montana*, 366 U.S. at 315 (based on finding no affirmative misconduct; "we need not stop to inquire whether, as some lower courts have held, there may be circumstances in which the United States is estopped to deny citizenship because of the conduct of its officials").

- 16 -

What is clear is that, at a minimum, affirmative misconduct by the INS must be shown before an equitable estoppel claim will be considered. *Fano*, 806 F.2d at 1264-65 ("The Supreme Court has indicated, without deciding, that equitable relief may be available to a private party aggrieved by certain conduct of government officials"). "'Affirmative misconduct' requires an affirmative misrepresentation or affirmative concealment of a material fact by the government." *Linkous v. United States*, 142 F.3d 271, 278 (5th Cir. 1998).

a.

Moosa can point to no evidence indicating that the dismissal as untimely of his initial appeal to the LAU was an act of affirmative misconduct. In his reply brief, he asserts that the LAU "contrived an easy way to dismiss [Moosa's] appeal" by claiming that the dates relevant to the timely filing of the appeal were different than they actually were. Moosa states: "The record, *of course*, shows that the Notice of Denial was issued on April 20, 1992 and not on April 15, 1992, as the LAU claimed". (Emphasis added.)

It belies common sense for Moosa now to argue that the error in computing the timing of the notice of appeal was clearly obvious, when the mistake was not noticed by Moosa, or his previous or present counsel. Rather, the INS discovered the error in preparing to address this petition. It then contacted Moosa and

- 17 -

moved to remand the case to the LAU; the INS did not attempt to bury the mistake. Moosa's estoppel claim fails on this basis. *See, e.g.*, **Office of Personnel Management v. Richmond**, 496 U.S. 414, 419-20 (1990) (no estoppel for mistaken, unauthorized statements of Government agent); **Miranda**, 459 U.S. at 18 (even if delay in processing application was negligent, estoppel still not warranted); **Schweiker**, 450 U.S. at 789 (erroneous advice given by agent not enough to estop Government); **Fano**, 806 F.2d at 1265 (to estop Government, need more than mere negligence or inaction).

b.

Moosa also rests his estoppel claim on the asserted affirmative misconduct of the Legalization Director in considering Moosa's deferred adjudication a "conviction", in spite of **Martinez-Montoya**. Moosa charges the Legalization Director with "knowing[ly] and deliberate[ly] refus[ing] to obey the controlling law of this Circuit".

Moosa misses the mark. We do not review the actions of the Legalization Director; his was an interim decision superceded by the LAU's December 1997 decision. Title 8 U.S.C. § 1255a(f)(3) and (4) provide for a single level of appellate review of decisions within the INS. The LAU reviews decisions of the Legalization Director. 8 C.F.R. §§ 103.1(f)(2), 245a.2(u)(2), 245a.3(j).

Our basis of review for INS legalization determinations is described in 8 U.S.C. § 1255a(f)(4)(B):

- 18 -

> Such judicial review shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole.

We review the decision by the *appellate authority* (*ie.*, the LAU), *not* that of the initial adjudicatory entity (*ie.*, the Legalization Director). *Cf.* **Castillo-Rodriguez v. INS**, 929 F.2d 181, 183 (5th Cir. 1991) (order of IJ not final when alien appeals to BIA; "[t]his Court is authorized to review only the order of the Board, not the decision of the [IJ]"). The only legalization decision before us is the LAU's December 1997 decision.[5]

## 2.

Moosa asserts that, even under IIRIRA § 322(a), 8 U.S.C. § 1101(a)(48), his deferred adjudication should not be treated as a conviction. On reviewing an Agency's construction of a statute it administers, we must perform the well-known two-step inquiry:

---

[5]Even though Moosa informed the Legalization Director of **Martinez-Montoya** and, yet, the Legalization Director did not apply it, we do not have evidence that he deliberately ignored it. His decision does not indicate that he disagreed with **Martinez-Montoya** or that he was choosing to disobey it. Rather, the decision indicates only that he viewed Moosa's deferred adjudication as a conviction under **Ozkok**. There is no evidence that the Legalization Director was intentionally flouting the law of this circuit, and we will not attribute ill will or bad motives to him without any evidence in this regard. In any event, as discussed, Moosa's recourse was with the LAU.

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). *See also* **Martinez-Montoya**, 904 F.2d at 1021 ("The federal agency construction is to be upheld if it is reasonable and not contrary to Congressional intent").

### a.

The text of § 322(a) could not be more clear: Where an adjudication of guilt has been withheld, a "conviction" exists where "(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed". Again, this definition mirrors that outlined by the LAU in **Matter of M**, in which a Texas deferred adjudication was found to constitute a conviction.

Considering only the text of § 322(a), a Texas deferred adjudication, *see supra* note 1, is a "conviction".[6] Under Texas law, a judge may enter a deferred adjudication "after receiving a plea of guilty or plea of nolo contendere, hearing the evidence, and finding that it substantiates the defendant's guilt". TEX. CODE CRIM. P. ART. 42.12 § 5(a). Moosa entered a plea of guilty. The first prong of § 322(a)'s definition of "conviction" has been met.

The second prong is that some form of punishment or restraint on liberty is imposed. Texas law provides that, upon finding guilt and determining that a deferred adjudication would be in the best interests of the community, the judge may "place the defendant on community supervision". TEX. CODE CRIM. P. ART. 42.12 § 5(a). The judge may also "impose a fine applicable to the offense and require any reasonable conditions of community supervision". TEX. CODE CRIM. P. ART. 42.12 § 5(a). Among other things, Moosa served time in jail on work release, had to report to a probation officer every month for the term of his community supervision, and was required to attend counseling. This was a punishment and a restraint on his liberty. *See **Hicks ex rel. Feiock v. Feiock***, 485 U.S. 624, 640

---

[6]In at least one case, a Texas court has recognized that the new definition of "conviction" has altered the immigration consequences of a deferred adjudication. ***Ex parte Silva***, 963 S.W.2d 945, 945 (Tex. Ct. App. 1998) ("Due to recent changes in federal immigration law, the INS now considers Silva's deferred adjudication status to be the equivalent of a conviction for the three counts charged in the indictment"), *vacated on other grounds*, 968 S.W. 2d 367 (Tex. Ct. Crim. App. 1998).

n.11 (1988) ("a fixed term of probation is itself a punishment that is criminal in nature").[7] Moosa's deferred adjudication satisfies the second prong of § 322's "conviction" definition.

Our conclusion accords with *United States v. Campbell*, 167 F.3d 94 (2d Cir. 1999), the only other circuit court case we have found that specifically references § 322, 8 U.S.C. § 1101(a)(48). In that case, the defendant's federal sentence was enhanced because of a Texas conviction that was later "set aside" after the defendant successfully completed his probation. *Id.* at 96. In affirming the enhancement, the Second Circuit first stated that "[t]he immigration laws contain no ... indication that they are to be interpreted in accordance with state law". *Id.* at 97. After citing the new IIRIRA § 322, 8 U.S.C. § 1101(a)(48), definition of "conviction", the court stated: "No pertinent provision in Title 8 gives controlling effect to state law. *And no provision excepts from this definition a conviction that has been vacated*". *Id.* at 98 (emphasis added). Although the Second Circuit did not address the precise issue at hand, its decision evidences a plain language reading and application of the new definition of "conviction".

---

[7]Although it is appropriate to look to federal, rather than state, law to determine this issue, community supervision resulting from a deferred adjudication is considered "punishment" for purposes of plea negotiations under Texas law, thus satisfying the second prong of the definition of "conviction" in § 322(a). *See* *Watson v. State*, 924 S.W.2d 711, 714 (Tex. Ct. Crim. App. 1996)(en banc)(deferred adjudication is punishment).

Moosa's deferred adjudication meets each prong of the new definition of "conviction". Accordingly, his deferred adjudication was a conviction for purposes of the immigration laws.

b.

The second question is whether the LAU properly applied this new definition, which became law in 1996, to Moosa's 1990 deferred adjudication. In addressing this issue, the LAU quoted the language from the Conference Report indicating that § 322 was designed to clarify Congressional intent. The LAU then stated: "As Congress evidently considers the holding in *Matter of Ozkok* to be incorrect, and has endeavored to clarify its original intent, it would be inappropriate for the LAU to make a decision today that deliberately ignored both the law in effect today and Congress's apparently long-held view". The LAU found that "it was Congress's intent that the new definition of conviction be applied immediately and to all criminal proceedings, whether in the past, present, or future".

Section 322(c) states unequivocally: "EFFECTIVE DATE.-- The amendments made by subsection (a) shall apply to convictions and sentences entered *before*, on, or after the date of the enactment of this Act". (Emphasis added.) The INS asserts that the LAU was required to apply the law in effect at the time it rendered its decision. Indeed, the Supreme Court stated in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 226 (1995): "When a new law makes clear

that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly". *See also Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994) (court must apply law that is effective at time of rendering decision); *Elramly v. INS*, 131 F.3d 1284, 1285 (9th Cir. 1997) (quoting *Plaut*). Therefore, the LAU was correct in applying the law in effect at the time of its December 1997 decision (*i.e.*, IIRIRA § 322) if the law is retroactive.

On the other hand, there is a "presumption against retroactive legislation [that] is deeply rooted in our jurisprudence". *Hughes Aircraft Co. v. United States ex rel. Schumer*, 117 S. Ct. 1871, 1876 (1997) (quoting *Landgraf*, 511 U.S. at 265). The Supreme Court has stated, however, that the principle of applying the law in effect at the time of the decision does not conflict with the "presumption against retroactivity when the statute in question is unambiguous". *Landgraf*, 511 U.S. at 273. More recently, the Court stated that this presumption against retroactivity is applied "unless Congress has clearly manifested its intent to the contrary". *Hughes Aircraft*, 117 S. Ct. at 1876; *see also United States v. Rocha*, 109 F.3d 225, 228 (5th Cir. 1997).

The plain language of § 322(c) leaves no doubt that Congress intended for the definition in § 322(a) to be applied retroactively. Congress could not have more clearly expressed this

intent than through its statement that § 322(a) was to apply to convictions entered *before* the date of IIRIRA's enactment. In any event, Moosa does not contest that the plain language of § 322(c) mandates retroactive application. Rather, he claims (1) that the use of "conviction" in § 322(c) with regard to pre-enactment adjudications requires use of the *Ozkok* definition; (2) that the new statutory definition does not eliminate the requirement of finality; and (3) that applying the new definition to him would raise retroactivity concerns because it increases his liability for past conduct.

First, Moosa asserts that § 322(c) requires the use of the *Ozkok* test when dealing with adjudications entered before IIRIRA's effective date. This contention is based on the following logic: § 322(a) applies to him only to the extent that his deferred adjudication was a "conviction" under the pre-IIRIRA test (i.e., *Ozkok*); and, because his deferred adjudication was not a conviction under that test, § 322(a) does not apply to him at all.

Moosa's argument makes no sense. He would have us hold that Congress created a new definition of "conviction" in § 322(a), but expected courts and the INS to apply the old definition with regard to § 322(c). Moosa's interpretation of § 322(c) would read its retroactivity provision out of the statute.

Further, § 322(c) states that § 322(a) applies to "convictions" entered before the effective date of IIRIRA. In

interpreting a statute, it is presumed that words used in the same statute have the same meaning. ***United States National Bank of Oregon v. Independent Ins. Agents of America, Inc.***, 508 U.S. 439, 460 (1993); ***Commissioner v. Keystone Consolidated Indus., Inc.***, 508 U.S. 152, 159 (1993) ("It is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning") (internal quotations omitted). Here, we are construing the word "conviction" as contained not only in the same statute, but in the same section. Accordingly, in light of this presumption, and applying the most logical reading of the plain language of § 322 in its entirety, we conclude that the word "conviction" means the same in § 322(c) as it does in § 322(a). The LAU properly applied the new definition to Moosa's deferred adjudication.

Moosa makes an even weaker argument in asserting that § 322(c) requires a conviction *and* a sentence in order for it to apply, and that, under Texas law, there can be no "sentence" for a deferred adjudication. First, we do not read § 322(c) to require *both* a conviction and a sentence. Instead, § 322(c) states that it "shall apply to convictions and sentences". This indicates that § 322(c) *applies* to *both* convictions and sentences; we do not read it as *requiring* both a conviction *and* a sentence. Finally, Moosa errs in using Texas law to interpret the meaning of "sentence" in § 322(c), because "[i]n the absence of a plain indication to the contrary,

- 26 -

... it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law". *NLRB v. Natural Gas Utility Dist.*, 402 U.S. 600, 603 (1971) (quoting *NLRB v. Randolph Electric Membership Corp*. 343 F.2d 60 (4th Cir. 1965)); *see also* *Campbell*, 167 F.3d at 98 (citing 8 U.S.C. § 1101(a)(48) and noting that "[n]o pertinent provision in Title 8 gives controlling effect to state law"). Although not controlling, we note that our court has found Texas deferred adjudications to be "sentences" under the federal Sentencing Guidelines. *United States v. Valdez-Valdez*, 143 F.3d 196, 201 (5th Cir. 1998); *United States v. Giraldo-Lara*, 919 F.2d 19, 22 (5th Cir. 1990).

Next, Moosa claims that the new statutory definition of "conviction" does not eliminate the requirement of finality, which, ever since the Supreme Court's decision in *Pino*, has been used as an additional requirement for the definition of "conviction", as discussed *supra*. *See, e.g.*, *White*, 17 F.3d at 479; *Martinez-Montoya*, 904 F.2d at 1025; *Ozkok*, 19 I&N at 553 n.7.

In support of this proposition, Moosa cites *Wilson*, 43 F.3d at 215, in which our court stated that "the decision of the BIA to apply a federal conviction standard in *Ozkok* does not infringe at all, either explicitly or implicitly, upon the Supreme Court's holding in *Pino*". Again, it is important to note that, prior to the enactment of IIRIRA § 322(a), there was no definition of "conviction" in the immigration laws. *See Will v. INS*, 447 F.2d

529, 531 (7th Cir. 1971) ("The parties have not cited, nor have we found, anything of significance in the legislative history of the [INA] casting light on the precise concept Congress sought to embody by the use of the term 'convicted' in Section 241(a)(11)").

Thus, courts were called upon to discern the meaning intended by Congress. Indeed, in *Pino*, the Court stated that the "conviction [had not] attained such finality as to support an order of deportation *within the contemplation of § 241 of the Immigration and Nationality Act*". *Pino*, 349 U.S. at 901 (emphasis added). Therefore, *Pino*, the case from which our court and others drew the finality requirement, was interpreting the then-undefined term "conviction" in the immigration laws. *See* *Will*, 447 F.2d at 531 ("[I]t appears clear that the Supreme Court's decision in *Pino* ... and from past administrative interpretation that [INA § 241(a)(11)] contemplates a conviction which has attained a substantial degree of finality"); *In re Punu*, Interim Decision (BIA) 3364, 1998 WL 546634 (Aug. 18, 1998)(Grant, Board Member, Concurring) (discussing why judicially created finality requirement has not survived IIRIRA).

Now, however, Congress has provided a definition. The Conference Report, quoted *supra*, shows that Congress was well aware of the varying interpretations of "conviction", but chose to enact the current definition. Again, our starting point is with the plain language of the statute. *See* *Uniroyal Chemical Co., Inc. v.*

- 28 -

***Deltech Corp.***, 160 F.3d 238, 244 (5th Cir. 1998), *opinion modified on rehearing*, 1999 WL 7912 (5th Cir. 1999) ("When the language [of the statute itself] is plain we must abide it; we may depart from its meaning only to avoid a result so bizarre that Congress could not have intended it" (internal quotation omitted)); ***United States v. Silva-Chavez***, 888 F.2d 1481, 1483 (5th Cir. 1989) (interpreting words at their plain meaning where Congress explained in legislative history that words meant exactly what they say); ***United States v. Bo***, 472 F.2d 720, 722 (5th Cir. 1972) (per curiam) ("In construing statutes, words are to be given their natural, plain, ordinary and commonly understood meaning unless it is clear that some other meaning was intended").

There is no indication that the finality requirement imposed by ***Pino***, and this court, prior to 1996, survives the new definition of "conviction" found in IIRIRA § 322(a). Not only did Congress omit such a requirement from its definition of "conviction", but the legislative history demonstrates that Congress *deliberately* eliminated the third prong of the ***Ozkok*** test (which appears to incorporate a finality concept). H.R. Conf. Rep. No. 828, 104th Cong., 2nd Sess. 1996, 1996 WL 563320 at *496 ("This section deliberately broadens the scope of the definition of 'conviction' beyond that adopted ... in ***Matter of Ozkok***"). More important, the Conference Report specifically cites deferred adjudications as being covered by the new definition. H.R. Conf. Rep. No. 828,

104th Cong., 2nd Sess. 1996, 1996 WL 563320 at *497 ("This new provision, by removing the third prong of *Ozkok*, clarifies Congressional intent that even in cases where adjudication is 'deferred,' the original finding or confession of guilt is sufficient to establish a 'conviction' for purposes of the immigration laws").  Earlier judicial interpretations of the term "conviction" in immigration laws were made without the clear definition enacted in 1996; finality is no longer a requirement. *See **In re Punu***, Interim Decision 3364, 1998 WL 546634 (Aug. 18, 1998) (a post-IIRIRA decision in which BIA determined that a Texas deferred conviction was a "conviction" under § 322, without applying a finality requirement).[8]

Next, Moosa asserts that applying the new definition of "conviction" to him presents retroactivity concerns because it increases his liability for past conduct.  He asserts that he agreed to the deferred adjudication plea agreement "with an entirely different understanding of the immigration consequences of his plea".  This assertion is not borne out by the facts.  When Moosa entered into the plea agreement in January 1990, ***Martinez-***

---

[8]In any event, whether the finality requirement has survived is a moot issue with regard to Moosa, as he has successfully completed his deferred adjudication.  Approximately five years ago, Moosa was released from community supervision.  According to Texas law, after community supervision has ended, "the judge shall dismiss the proceedings against the defendant and discharge him".  TEX. CODE CRIM. P. ART. 42.12 § 5(c).  At this point the proceedings against Moosa are final and there is no longer a possibility of appeal from his deferred adjudication.

*Montoya* had not been issued and *Matter of M* (a 1989 decision) was still the law. It was not until July 1990, several months *after* Moosa pled guilty, that *Martinez-Montoya* was decided. In short, the current definition of conviction is, in fact, the *same* as the definition when Moosa pled guilty. In any event, "it is well settled that Congress has the authority to make past criminal activity a new ground for deportation". *Ignacio v. INS*, 955 F.2d 295, 298 (5th Cir. 1992) (citing *Lehman v. United States*, 353 U.S. 685, 690 (1957); *Mulcahey v. Catalanotte*, 353 U.S. 692, 694 (1957)); *United States v. Bodre*, 948 F.2d 28, 32 (1st Cir. 1991), *cert. denied*, 503 U.S. 941 (1992).

Moosa maintains that taking away the finality requirement would lead to absurd results, such as an alien being deported when his conviction is on appeal, but the conviction later being reversed. As discussed, that it not the case here. Be that as it may, such concerns are more properly addressed to Congress. Congress has made the policy choice to eliminate the finality requirement, and we will not second-guess such policy choices properly made by the legislative branch. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 237 (1981) (Powell, J., concurring) (Congress has been "vested by the Constitution with the responsibility of protecting our borders and legislating with respect to aliens"); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("Our cases have long recognized the power to expel or exclude aliens as a fundamental

sovereign attribute exercised by the Government's political departments largely immune from judicial control" (internal quotation omitted)); *Carlson v. Landon*, 342 U.S. 524, 534 (1951) ("So long, however, as aliens fail to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 590 (1952) ("Judicially we must tolerate what personally we may regard as a legislative mistake"); *Rodriguez v. INS*, 9 F.3d 408, 413 (5th Cir. 1993) ("This Court has recognized Congress's 'unbounded power' in the area of immigration"); *Bright v. Parra*, 919 F.2d 31, 34 (5th Cir. 1990) (Because immigration legislation policy questions are "entrusted exclusively to the political branches of our Government, ... we have no judicial authority to substitute our political judgment for that of the Congress" (quoting *Fiallo v. Bell*, 430 U.S. 787, 798 (1977)).[9]

---

[9]Our construction of § 322 is in accord with the standard of review of agency constructions of statutes they are charged with enforcing. As noted, the first question is whether Congress has directly spoken to the question at issue. *Chevron*, 467 U.S. at 842-43. Congress has done so.

Even if we were to assume (as Moosa appears to assert) that the statute is ambiguous, the next step would be for us to ask whether the INS's construction of § 322 is "based on a permissible construction of the statute". *Id.* Based on the plain language of § 322 and the strong language in the Conference Report, in which Congress expressed its intent to change the then-controlling judicial and agency constructions of "conviction", the INS's

- 32 -

In sum, we conclude that the INS is not estopped from denying Moosa citizenship; IIRIRA eliminated the requirement of finality; the definition of "conviction" in IIRIRA § 322(a) encompasses Texas deferred adjudications; the LAU correctly applied IIRIRA § 322(a) to Moosa; and applying § 322(a) to Moosa did not raise any retroactivity concerns.

B.

Mr. and Mrs. Moosa also challenge the decision of the BIA denying suspension of their deportations. The INS contests our jurisdiction.

Prior to the enactment of IIRIRA, INA § 244, 8 U.S.C. §1254(a)(1) (now repealed), provided that the Attorney General, "in [her] discretion", could suspend the deportation of an otherwise deportable alien if the alien: (1) had been physically present in the United States for seven years; (2) was of good moral character; and (3) "[was] a person whose deportation would, in the opinion of the Attorney General, result in exceptional and extremely unusual hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence". *See also* **INS v. Jong Ha Wang**, 450 U.S. 139, 139-40 (1981) (per curiam). Even if all three factors are met,

---

construction of § 322 is reasonable.

however, the Attorney General could, in her discretion, deny suspension. 8 U.S.C. §1254(c) (now repealed).

In reviewing denials based on one of the first two factors, we upheld the BIA's decision if it was supported by "substantial evidence". *Ramos v. INS*, 695 F.2d 181, 185 (5th Cir. 1983). Denials based on a finding of no extreme hardship were reviewed for abuse of discretion. *Id.*

IIRIRA established transitional rules that applied to BIA decisions filed between 31 October 1996 and 31 March 1997. IIRIRA § 309(c)(4) ("In the case ... in which a final order of ... deportation is entered more than 30 days after the date of the enactment of this Act [30 September 1996], notwithstanding any provision of section 106 of the [INA] ... to the contrary ... (E) there shall be no appeal of any discretionary decision under section ... 244 ... of the [INA]"). Because the BIA decision denying the Moosas suspension of deportation was entered on 31 October 1996, IIRIRA's transitional rules apply. *See Eyoum v. INS*, 125 F.3d 889, 891 (5th Cir. 1997); *see also Meguenine v. INS*, 139 F.3d 25, 26 (1st Cir. 1998); *Pilch v. INS*, 129 F.3d 969, 970-71 (7th Cir. 1997) (final deportation orders entered after 30 September 1996 are subject to IIRIRA § 309(c) transitional rules). Under the transitional rules, INA § 309 precludes judicial review of "discretionary determinations" whether to suspend deportation pursuant to INA § 244.

As an initial matter, Moosa asserts that, just because the BIA's decision was filed on 31 October 1996 does not mean that it was "entered" on that date, so the transitional rules do not apply here.  We reject this contention as without merit.  *Cf.* ***Karimian-Kaklaki***, 997 F.2d 108, 110-11 (5th Cir. 1993); ***Guirguis v. INS***, 993 F.2d 508, 509 (5th Cir. 1993); ***Ouedraogo v. INS***, 864 F.2d 376, 378 (5th Cir. 1989).

At issue is whether the BIA's decision to deny suspension of deportation to Mr. and Mrs. Moosa was "discretionary", thus precluding our review.  The Moosas claimed entitlement to suspension due to the extreme hardship they would suffer if deported.

The bases for this claim were:  (1) they have community ties in the United States, including membership in a church; (2) if deported, Moosa would be unable to provide his daughters with the financial support to continue their education; (3) Mrs. Moosa suffers from diabetes and back pain; (4) it would be difficult for Moosa to find a job in Pakistan and the cost of living there is very high; (5) drinking water and reliable electricity are not readily available in Pakistan; and (6) their standard of living in the United States is better than it would be in Pakistan.

At the deportation hearing, Moosa admitted the factual bases for the 1990 deferred adjudication; stated that he felt "very sorry" about his actions; and promised to refrain from such

behavior. On being questioned about complaints filed by six or seven other children, ranging in age from 10-12, that Moosa had also molested them, Moosa admitted that he had also "grabbed and molested" those children, but claimed total rehabilitation. He also indicated that every molestation had taken place during his employment at a particular store, but that he had not repeated such actions since ending his employment there.

With regard to Mr. Moosa, the BIA made it clear that it was denying his request for suspension based on its discretion. Although the BIA noted that it did not find that Moosa had proven extreme hardship, it stated that, even if he had proved all three required elements, "a favorable exercise of discretion is not warranted". Because the BIA was making a discretionary decision, § 309 instructs that we do not have jurisdiction. *See* **Kalaw v. INS**, 133 F.3d 1147, 1152 (9th Cir. 1997) ("if the Attorney General decides that an alien's application for suspension of deportation should not be granted as a matter of discretion in addition to any other grounds asserted, the BIA's denial of the alien's application would be unreviewable under the transitional rules").

The question with regard to Mrs. Moosa is one of first impression in this circuit. The BIA found that she satisfied the first two factors, but that she did not demonstrate that she would suffer extreme hardship if deported. Thus, at issue is whether IIRIRA § 309 deprives us of jurisdiction when the BIA bases its

decision to deny suspension on the failure to demonstrate extreme hardship.

Initially, we note that the power of courts to review deportation decisions is subject to the will of Congress. As the Supreme Court stated nearly 50 years ago:

> The power to expel aliens, being essentially a power of the political branches of government, the legislative and executive, may be exercised entirely through executive officers, with such opportunity for judicial review of their action as congress may see fit to authorize or permit. This power is, of course, subject to judicial intervention under the paramount law of the constitution.

*Carlson v. Landon*, 342 U.S. 524, 537 (1952) (internal quotations and citations omitted). *See also Lucacela v. Reno*, 161 F.3d 1055, 1058 (7th Cir. 1998) ("this court has recognized Congress' ability to determine the scope of the court's review of INS decisions"); *Skutnik v. INS*, 128 F.3d 512, 514 (7th Cir. 1997) ("although the Constitution may require judicial review of a claim of legal entitlement to remain in the United States, it does not require review of claims that executive officials should make exceptions to the rules defining who is legally entitled to reside in the United States"). Thus, the scope of our review of denials of suspension of deportation, including whether we are able even to review such denials, is within the control of Congress.

Although our court has not yet addressed whether we lack jurisdiction over denials of suspension based on a finding of no

extreme hardship, it has been addressed in both the Seventh and Ninth Circuits.  In **Kalaw**, the Ninth Circuit addressed the changes that § 309(c) had made with regard to judicial review of such denials.  Examining each of the three INA § 244 elements, the court first found that the continuous physical presence element was a factual inquiry, rather than a discretionary decision, that was reviewed for substantial evidence; thus, § 309(c) did not divest the court of its jurisdiction.  **Kalaw**, 133 F.3d at 1151.  Next, the court found that it retained jurisdiction to review findings of bad moral character under one of the statutory *per se* categories; but, that § 309(c) stripped the court of jurisdiction over denials based on a finding of bad moral character apart from the *per se* categories.  **Id.**

Finally, the court addressed denials based on the extreme hardship element.  It stated that a determination that no extreme hardship exists "is clearly a discretionary act".  **Id.** at 1152. The court held that, as a result, "[t]he transitional rules ... preclude direct judicial review of the BIA's determinations of the threshold eligibility requirements of 'extreme hardship' and the discretionary determination of 'good moral character'".  **Id.**  In accord with this decision, the Ninth Circuit has found in several cases that it lacked jurisdiction to review  BIA decisions denying suspension of deportation based on a finding of no extreme hardship.  *See* **Robles v. INS**, 161 F.3d 14, 1998 WL 479464 (9th Cir.

1998) (unpublished); *Sagrero v. INS*, 161 F.3d 14, 1998 WL 479475 (9th Cir. 1998) (unpublished); *Perez-Garcia v. INS*, 161 F.3d 13, 1998 WL 479470 (9th Cir. 1998) (unpublished); *Lee v. INS*, 145 F.3d 1339, 1998 WL 276849 (9th Cir. 1998) (unpublished); *Sontay v. INS*, 142 F.3d 445, 1998 WL 225065 (9th Cir. 1998) (unpublished); *Kechichian v. INS*, 141 F.3d 1176, 1998 WL 133183 (9th Cir. 1998) (unpublished).

Likewise, in *Skutnik*, the Seventh Circuit stated that, where the petitioner requested review of a BIA decision based on extreme hardship, "there can be no doubt that [the petitioner] wants review of a 'discretionary decision'". *Skutnik,* 128 F.3d at 514. However, because the alien in *Skutnik* conceded at oral argument that IIRIRA precluded judicial review of the BIA's decision, the court stated that it "need not confront any of the interpretive issues that lurk beneath its surface". *Id.*

We join our sister circuits in holding that denials of suspension based on the INS § 244 element of "extreme hardship" are discretionary decisions, which IIRIRA § 309(c) precludes us from reviewing. This determination is based not only on the above decisions from other circuits, but also on Supreme Court precedent. In *Jong Ha Wang*, 450 U.S. at 144, the Court stated:

> The crucial question in this case is what constitutes "extreme hardship." These words are not self-explanatory, and reasonable men could easily differ as to their construction. But the Act commits their definition in the first instance to the Attorney General and his

- 39 -

delegates, and their construction and application of this standard should not be overturned by a reviewing court simply because it may prefer another interpretation of the statute.

*See also* **INS v. Phinpathya**, 464 U.S. 183, 195 (1984) ("In **INS v. Jong Ha Wang**, we rejected a relaxed standard for evaluating the 'extreme hardship' requirement as impermissibly shifting *discretionary authority* from INS to the courts" (emphasis added)). Thus, the Supreme Court has indicated that determinations of extreme hardship are discretionary. Finally, our court formerly routinely reviewed BIA decisions based on the "extreme hardship" element under an abuse of *discretion* standard, further indicating that such determinations are discretionary. **Ramos**, 695 F.2d at 184-85 ("The decision whether to suspend the deportation of an alien who satisfies the three [§ 1254] requirements is ... discretionary ...").

In sum, because the BIA based its denial of Mr. Moosa's application for suspension on its discretion to do so, IIRIRA § 309(c) precludes our review of that decision. Likewise, because denials of applications of suspension based on the "extreme hardship" element of INA § 244 are discretionary, we also lack jurisdiction to review the decision concerning Mrs. Moosa.

### III.

For the foregoing reasons, the petition challenging the decision of the LAU denying Moosa permanent residency and

terminating his temporary residency is **DENIED**; the challenges to the BIA's decision denying the suspension of deportation for Mr. and Mrs. Moosa is **DISMISSED** for lack of jurisdiction.

*DENIED IN PART; DISMISSED IN PART*